313-0219 Michelle Hirono-Amakis v. Dennis Shane v. John DeFranco, M.D. Athlete by Catholic Library I think the facts in this case are pretty simple. Very briefly, on May 14, 2010, Mrs. Mackey came under the care of a doctor working in the emergency room. Her presenting symptoms were pain in her right flank in the area where she had a right kidney, and nausea and vomiting. While she was in the emergency room, the emergency room doctor did some laboratory testing. He did a CBC and a urinalysis. He also had a radiologic examination done, a CAT scan of the urinary tract. The lab tests showed laboratory signs of urinary tract infection, and the CAT scan was positive for the presence of an obstructing stone in the right ureter between the kidney and the bladder. As this patient's condition fell within that specialty known as urology, and as the emergency room doctor was not a urologist, he paged the urologist on call. He paged someone who was a specialist who was contractually obligated with the hospital to provide urologic services to patients in the emergency room at the hospital, and probably to patients in the ICU and various other spaces in the hospital. This was not an informal request that was made. This was a request for urologic services from a physician that had been chosen by the hospital to provide precisely these services to patients, precisely in the category that Michelle was in. And in this consult, the emergency doctor told the on-call urologist what the presenting symptoms were for the patient. He told them about what the results and findings were on the complete blood count and the urinalysis. The results were abnormal, and they did reflect at least the presence of a urinary tract infection. They told them about the presence of a stone. The doctor took notes, as a consultant would take notes, and the urologist evaluated the patient. As part of his evaluation, he decided that there was no sepsis here. As part of his evaluation, he decided that this patient did not need to be admitted to the hospital. The urologist did take affirmative action to involve himself in the care of this patient. He made specific recommendations for care, including that the patient be put on flow masks to help flush out the stone from her ureter, that she be treated for her pain with pain medication, and if his records are to be believed, he recommended antibiotics be used on the patient too. And he also took action to participate in the patient's care beyond the phone call. He asked to have the patient in his office, I believe it was on the following Monday. In doing that, it is our position he participated in a relationship out of which arose a duty of reasonable care and for the breach of which he would be responsible on damages. I think the case that is swirling on points is the Bovara VARA case. In that case, the requesting physician was a general cardiologist. He had a patient who had had an angiogram and he referred to two invasive cardiologists to have them review the angiogram films and to see whether this patient was a proper candidate for an angioplasty. These doctors did agree to review the film and in fact did and got back to the general cardiologist and said that he is a candidate for the angioplasty. The cardiologist communicated this back to the patient. The patient, relying on these things, consented to the surgery. The angioplasty was done and the patient died on the table. The procedural history of that case is that the lawsuit that was filed was dismissed on summary judgment against the two specialists based upon what the trial court perceived as an absence of doctor-patient relationship. This ruling was reversed on appeal and on appeal the court found that a question of fact existed concerning whether there was a doctor-patient relationship or a special relationship between the patient and the specialist, specifically where the following facts existed. The specialist knew that the services they were providing were for the benefit of the patient. The specialist had actual or constructive knowledge that the medical opinions that they were providing and the care they were providing were crucial to the patient and the requesting physician had no expertise on whether, in this case, the patient was a candidate for the procedure of the angioplasty. We have all three of those factors in our case. In our case, the urologist knew that his services were being provided for the benefit of the patient. He was being consulted specifically because he was the on-call physician and he was contractually obligated to provide these services and he knew they were being provided for the benefit of this particular patient who had signs and symptoms of a urologic condition. The urologist had actual knowledge that the opinions that he was rendering and the actions he was taking and the things that he was saying were crucial to the patient. The decision not to admit the patient would be crucial to this patient. The decision on whether or not to put the patient on antibiotics would be a crucial thing for this patient. As it turns out, the aftermath of all this is that the patient was discharged and later on returned. By the time she returned, she now was in septic shock. Because of the septic shock, she had metabolic problems which caused hypoxic injury to her and multi-system organ failure and a bunch of other things, all arising out of an untreated urinary tract infection. So the decisions he was making were crucial to the patient and he would know that they would be. At a minimum, he would have constructive knowledge of this, even if he doesn't admit that he does. This requesting doctor, the emergency room doctor, had no expertise on what the patient's condition was from a urologic standpoint. The emergency room doctor has admitted that he relied entirely on the urologist and that his actions were guided by the information provided by the urologist. As a result, the patient wasn't admitted and the patient didn't receive antibiotics. The patient wasn't monitored while she was on antibiotics and a parade of horrible things happened to her because of it. Now, help me out with facts on this. When she left the emergency room, was she given an antibody prescription? She was not. The notes that were taken by the urologist indicated that he recommended antibiotics. There is an issue here. The emergency room doctor said that the urologist never recommended antibiotics and he said that he relied completely on the urologist for all things urological, as he would. Okay, because the fact that she left without antibiotics and you have urologists who suggest antibiotics might suggest that the physician-patient relationship rested with the ER doctor and that this may not have been a physician-patient relationship with the urologist. I guess, how do you deal with this Gillespie case? When does a consultation by a physician become the establishment of a relationship with the person, the doctor, the physician to whom that treating physician has consulted? That's really the whole issue here, I guess. It's a fact-intensive perhaps issue, maybe not, but I mean, every tuber is on its own bottom and we have Gillespie here. Well, I think the physician-patient relationship exists, or at the minimum, the question of fact exists as to that relationship. Number one, where the physician, the person whose care is being requested, is seeing the patient as the on-call physician, the person who has been designated by the hospital to provide precisely this type of care to precisely this population of patients, patients in the emergency room. This is not a casual relationship that's going on with a doctor that is free to refuse to be involved with this patient. This is a doctor who is contractually obligated to provide these services. Okay, is that the distinction? I see, you know, there's a lot of slip and sloping here, you know, in terms of actually, I don't know, it's almost like a chain reaction accident. Okay, who's at fault here, so to speak? Okay. And that's, it seems there's apparently no bright line, is that right? I think each case probably is decided on its own facts, so I don't see this as having broad implications. Yeah, is it kind of like, I'm struggling with this, because if that is the case, then there has to be some overarching principle involved. One is, is the object of the person who's being consulted, is the object of their advice and counsel to the physician, or is it to the physician's patient? You know, that is an excellent point, and I think that the urologist, by engaging in this contractual relationship with the hospital to provide on-call services, has consented to providing care, urologic care, to the plaintiff and to other people in her class and category. And I think this is, it's a matter of looking at all of the facts and deciding whether this relationship rises to the level where it gives birth to a duty of reasonable care. Really, all we're here is not as to whether it's reasonable, we're here as to whether there is a duty. Right, I mean, all of these other issues may or may not be dealt with later on, but that's really the single issue here, isn't it? And it was a dismissal of DeFranco based on no relationship, therefore no duty. Yes, yes. And our position is there is a duty, because this is not two doctors having a check together, this is not an informal consult, this is not someone who is free to refuse to consult and refuse to provide care, this is someone who had an obligation to and did provide care. Well, how about this, again, because it is a single issue, okay, that Gillespie case and the idea of a chat, okay, doctors obviously consult with one another, share patient stories, share patient histories that may be past treatment, under treatment now, and it's like an educational process between doctors. You know, I've got a case here that involves XYZ and, you know, I've been reading the medical literature or whatever, what's your opinion about this? What would you do if you were me? It seems to me that something like that makes a clear demarcation that the person rendering, here's what I would do if I were you, does know there's a patient under treatment, does know the condition of the patient, but is not expecting that information necessarily to be applied to that patient. I think those facts are distinguishable from what we have here. Yeah, so is it the knowledge and certainty that what I'm saying might be an appropriate treatment or what I would do in treatment that if I know that that will actually be done to that person, let's leave out the fact that I may or may not have a contract with an emergency room or hospital, is that kind of where we're getting close to establishing a relationship? I think we are. I think that the capillary here, the urologist, had a reasonable expectation that because he was being consulted for this care, his recommendations would be taken and he acted as if he had that reasonable expectation. He actually made future plans for care and he said, this is what you should do, do this, do that. He was consulted not in the context of, gee, have you ever had a patient like this? He was consulted because he was the hospital's designated person for providing care, providing these services. Thank you. Good morning. Good morning. May it please the court. Counsel, my name is Catherine Wyler. I represent Dr. DeFranco in this case, the Appley. We're asking that the court affirm the ruling of the circuit court for two separate independent reasons. The first is because there was no physician-patient relationship in this case and the circuit court correctly determined that as a result, Dr. DeFranco owed Mrs. Mackey no duty and therefore the case should be dismissed. The second basis that this court should use to affirm that decision is the issue I'd like to start with, with the court today. And that is the problem of time. The claims that Mrs. Mackey brought against Dr. DeFranco were time-barred. And that alone, that of itself, is a reason that this court, or the reason that this court should adopt in affirming the circuit court's decision. Did the trial judge render an opinion on that or decide that issue? What the trial judge allowed, he allowed the plaintiffs to file a late motion to convert based on respondent in discovery, based on section 2-402. The problem with that is that Dr. DeFranco's status as a respondent in discovery expired as a matter of law months before the motion to convert was filed. I think a very quick timeline is important to understand those issues. The alleged malpractice occurred on May 14, four years ago today, May 14, 2010. The complaint was filed on April 7, 2011. Dr. DeFranco was identified as a respondent in discovery by motion on July 21, 2011. And the court allowed Dr. DeFranco to be identified as a respondent in discovery on July 26, 2011. So working from that date, July 26, 2011, the plaintiff had until January 26, 2012, to convert Dr. DeFranco into a defendant in the case or to ask for additional time under the statute. Either option is available. Either option could have occurred in this case. There's nothing in the record that suggests there was an issue there. The plaintiff did not move to convert Dr. DeFranco to be a defendant in this case until September 18, 2012. And that was after Dr. DeFranco had filed a motion to terminate his status as a respondent in discovery. That motion was filed nearly nine months too late. It was too late at that point. Therefore, the circuit court's decision allowing a conversion from a respondent in discovery to a defendant, that was improper. That couldn't occur at that point in this litigation. This case is a bit unusual in that at the time the respondent in discovery status lapsed as a matter of law. That's that January 26 date. The statute of limitations had not yet ended. It had not yet run. So if the plaintiff wanted to bring Dr. DeFranco in as a defendant, she actually had until May 14 of 2012. She had several months later to do that. She could have. Again, there's nothing in the record that suggests that would have been an issue. It wouldn't have been. She didn't. So both because the time allowed under Section 2-402 had expired, and because the statute of limitations had expired in May of 2012, for both of those reasons, the plaintiff should not have been allowed to bring Dr. DeFranco in as a defendant in September of 2012. That was an error, and this court should find that, in fact, the trial court should have dismissed on that basis because the claims were time-barred. Now moving a little bit to, Justice Holdred, your questions about special relationship and whether there existed a physician-patient relationship in this case, the court was asking, what is the rule? There doesn't seem to be a bright line. Again, a little bit of structure I think is useful here. As the court knows, a physician-patient relationship can be formed in two different ways. There can be the direct formation of a physician-patient relationship, or what we're dealing with here is whether there was a special relationship that was created. That's a little bit different. The cases that have come down from the Illinois Appellate Court have identified two specific situations, and then they're limited situations, in which a special relationship can be identified. One is where the physician provides needed expertise that is wholly outside of the treating physician's realm. For example, we were discussing, counsel was discussing Bovara. In Bovara, the two physicians who were brought in to consult were cardiologic interventionists. They were experts in angiograms. They were experts in testing and in the performance of the procedure itself. The treating cardiologist could not do any of those procedures, could not read those tests, could not perform those services for the patient. That separate, independent, special expertise was needed. That's not what we have in this case. In this case, we have an emergency room physician with 30 years of experience. He said he had dealt with thousands of urinary tract infections, thousands of situations of patients in the emergency room dealing with kidney stones. He was capable of identifying their conditions. He was capable of understanding the test results that came back to a point. He suggested, for example, he couldn't do a complete read of a CT scan because he wasn't a radiologist, but he could review a CT scan and understand where a kidney stone was located in the scan. So he was capable of doing all of those things. And perhaps most importantly, Dr. Soroka, the emergency room physician, stated he was the one who could make decisions about prescriptions for a patient. Ultimately, if he felt a patient required antibiotics, he was the final arbiter of making that determination. If he disagreed with a specialist, it was Dr. Soroka who would make the decision about whether or not to prescribe antibiotics. He would not simply rely on the recommendation of the consult for that information. So this is not a case that falls into that needed expertise category. That's category one that the appellate court has given us. The only other category that's been identified by an Illinois appellate court is where a physician directs a course of treatment. So if you have a consulting on-call physician who is contacted, say, by a resident, and the on-call physician is directing the resident, you will do X, Y, and Z, supervising the resident. Or, for example, if you're looking at a case like the Lenahan case, that's the case that involved the cancer study and the physician who had created a chemotherapy protocol, that physician was determined to have a physician-patient duty to a patient because that physician was supervising the patient's treatment, even though he wasn't the treating physician for that patient. Again, that's not the situation we have here. Dr. DeFranco, the consulting urologist, was not directing Mrs. Mackey's course of treatment. Dr. DeFranco was consulting her. You say that only because the ER doctor could countermand that. Because the ER doctor had the experience. He wasn't a resident. He had the experience to make those decisions. He testified that he could make all decisions about her care, about Mrs. Mackey's care. He was capable of doing those things. He consulted with a urologist, absolutely. That's true. But that consult did not result in the dictation of her course of treatment. The emergency room physician was still the final decision-maker about her course of treatment. But he also said, I followed everything he told me to do. He said that he, as a matter of practice, he followed what any consulting physician he spoke with. So he didn't speak to this specific case. In this specific case, he was asked repeatedly, Dr. Soroka was asked repeatedly, would you prescribe antibiotics if indicated, even if a consulting physician told you it was not necessary? This is at page C863 in the record. It's in Dr. Soroka's deposition. And Dr. Soroka acknowledged, absolutely, if I felt that antibiotics were indicated, I would prescribe antibiotics, even if the consulting physician did not recommend it. And even hypothetically, if the consulting physician said they were unnecessary, and in my analysis of the patient, I determined that that was indicated, then I would make that call. I would do the prescription. I would take care of that for the patient. And that makes sense in the larger context of this case. Dr. Soroka could have called the on-call consulting urologist in to the hospital to give another opinion about the condition of the patient. Urology is not a specialty based solely on film and test results. There is a face-to-face analysis that happens with a patient, an evaluation of the patient's condition based on her presentation at the time. Dr. Soroka did not request that. And that's what an on-call physician is available to do. Rather, Dr. Soroka simply called Dr. DeFranco, gave him a relatively short description of her condition, saying she didn't have a fever, she was stable, she had a normal white blood cell count. He gave a very succinct explanation of what her condition was at the time. Did not ask for a separate, come in, take a look at her kind of pulse. Wasn't there a sepsis indication? There was not. From the records, it's a little bit difficult to tell. Dr. DeFranco's records have a line through sepsis. It says no sepsis. Because the patient had no fever, it was determined she wasn't septic at the time. But, obviously, her condition deteriorated. That's indicated somewhere. The reason he has the line through that is indicated. I didn't understand that he had said that it was because she didn't have a temperature. No, I'm sorry, Judge. I didn't mean to suggest that was the basis of drawing the line through the sepsis finding. There was no sepsis. As I recall from the deposition transcripts, Dr. DeFranco did not, he didn't have an independent recollection of the conversation that he had with Dr. Soroka. Same for Dr. Soroka. There's no independent recollection of the conversation. They're only working from those notes. That is the only mention of sepsis in the notes. I apologize if I was confusing you. There's sepsis written down on the line through it. That's correct. That's the only thing that's there.  Exactly. That's correct. There's no explanation. It's inferential as to what it means. That's correct. Exactly. Exactly. We have to draw the inferences from that. That's correct. In terms of Dr. Soroka's 30 years of experience, that he has the ability to look at a CT scan and see a kidney stone, even though he's not a radiologist, but that's not within the category of his privileges to diagnose, to read that film. To say that he has the experience and he knows what he's looking at is fine, but the reason that he would call Dr. DeFranco is because Soroka is not a urologist. Why is DeFranco on call not with Dr. Soroka but with the emergency room? He is on call to be available in the event that a urologist is needed, is needed to come in, is needed to consult with a patient. For the same reason a surgeon would be on call, an internist would be on call, a cardiologist would be on call. If a patient presents who requires immediate additional care from that specialist, then the hospital can immediately identify, this physician is available. We would call this physician, this physician has a contractual obligation to come into the hospital and provide that consult. Certainly those physicians can also be contacted less formally, which is what happened here. But that does not automatically create a legal duty between the consulting physician and the patient. And that's what we see in the case law. That's what happened in Weiss, for example, where the emergency room physician contacted the on-call psychiatrist at the time. And the first district did not determine that there existed, as a result of his status, the psychiatrist's status as the on-call physician. That did not create an independent physician-patient relationship. Rather, and this is more to Justice O'Brien's question, not to what the appellate court was specifically stating. But to your point, Justice O'Brien, that's because the on-call physician was available so that it was easy to identify exactly who should be contacted in the event that a consult is needed. That's the purpose of having an on-call physician. If Dr. Soroka had believed that this situation were significant enough that Mrs. Mackey's condition were such that he required a specific consult from the on-call urologist, he had the opportunity, Dr. Soroka, to contact the on-call urologist, here Dr. DeFranco, and have him come into the hospital to make that decision. That's not the consult that was requested. The request was simply in the nature of what you were describing earlier, Justice Holdren, as a much less formal, here's the condition, here's what the patient looks like, here are the numbers to the extent that they were shared, and it's not clear from the record that they were. But she doesn't have a fever, she's comfortable, her pain's under control. That's the description that's given. And at that point, Dr. DeFranco offers his recommendations for treatment, which, as Dr. DeFranco testified, can be taken or can be ignored by the emergency room physician. Now, it would be different if Dr. DeFranco were asked to come in, come into the emergency room, evaluate this patient, give us your evaluation of whether she should be admitted, give us your evaluation of her condition. That's not what happened here. And that's what separates this case from the cases such as Bolvara, where that particular consultation were absolutely necessary and could not be done by the treating physician, and that separates this case from a case more like Gillespie or like the Lanahan case where the physician is directing the course of treatment. That's the distinguishing factor. And it's very important to note, and this will just be my final point, as Justice Holdrege suggested, the danger here is the slippery, slow problem. It is the problem of public policy. If the court were to determine, as plaintiff is suggesting, that simply by agreeing to be on call, a physician is automatically in a physician-patient relationship with a patient, that means any physician who answers a telephone call as the on-call specialist for that particular hospital on that particular day, bam, no question, no issue of fact, automatically there's a physician-patient relationship there. That's not what the law says because that wasn't found in cases such as Weiss, and that can't be the policy of this state because that would create liability in any consulting physician. So with that in mind, the test that the other courts have laid out... Okay, so you're arguing public policy. It's twofold. It's not merely public policy. But one might ask their question, and what's wrong with that? And what's wrong with the immediate creation of a physician-patient relationship? Why should that be against public policy? If the physician isn't given complete information about a patient, if the physician isn't asked to give an evaluation of a patient, and by physician I mean consulting physician, if the consulting physician isn't... What happens if the consulting physician... These are all facts about whether he's negligent. We're talking about whether there's a duty. In that situation... A reasonable expectation, duty. That's what we're talking about, duty here. That's correct. So that suggests that any on-call physician is automatically in a duty, or I'm sorry, owes a patient a duty. Of what? Of, well, that's the question. Of what? Reasonable care? Apparently, but what if the physician is not actually asked to care for the patient? That's not the question. I mean, we're talking public policy. What's wrong with requiring a physician to have a duty of reasonable care? Is that not good public policy? It depends on whether the physician has a relationship with the patient. I agree that it is important that a physician who has a relationship with the patient owes the patient a duty of care. But there has to be a relationship first. And there is not simply a relationship because a physician answers the question. Well, if a physician has the relationship to be the consulting physician, and that physician is the one that, if there's a need for consult, that's who they call that specialist. Isn't that right? That's correct. So that's the protocol that's set up. That is the protocol. So what then is the reckoning for the consult, for the consulting doctor? They have no obligation? They're like Punch's pilot? They can say something and then wash their hands? No, absolutely not, Your Honor. If the consulting physician is required, meaning if the physician who requests the consult is saying to the consulting physician, I need you to come in and consult with this patient, then that consulting physician has an obligation to go in and consult and check the patient and evaluate the patient and make a determination about that patient's care. But that's a face-to-face meeting. I know we'd like to have that because that's very objective. But what if all the information that could be obtained from a face-to-face can be given over the phone? I mean, I'm not a doctor, but I think all of the bases that were initially examined of this patient seem to be probably a protocol written somewhere in a medical book. First you do this, first you do this, first you look at white blood counts, you do this, you do this. But you're also asking the patient questions about her condition, you're asking her questions about her pain, about her history, about how the pain has progressed, about how she's feeling at any particular time, about the location of the pain. You're observing her demeanor, you're observing her coloring, you're observing whether there are any other related issues. But we have blind doctors, too. We do. Who are given information about all of those conditions which can't be relayed by the ER doctor to over telephonic communication. But to the extent that the court is looking for a bright line rule, that can't be the bright line rule. There are situations that could go either way. For example, to your point, a physician consulting, say, over the internet, which is something that consulting physicians can do now. That's not an in-face hospital visit. And we are not suggesting that that is the only way that you could establish a physician-patient relationship. But, that said, you also have a situation such as this case, where a decision about patient condition and patient care cannot be made simply by virtue of a very short description from the ER doc. If the ER doc requires a full consult, that can be requested, and the consulting physician will be there. The consulting physician is obligated to do that.  Or, it's not as complete as consulting over the internet. You don't have that opportunity. Dr. DeFranco doesn't have that opportunity here because it's not requested. And what the court would be suggesting is that automatically, because a physician, a consulting physician, receives that call, he does have now an obligation, anytime he is called for consult, to come in and check the patient and see how the patient is doing. I don't think we're saying that. I think we're saying that in this day and age, so much of what a physician does, she takes tests, she orders tests from the patient, blood tests, other kinds of tests, and from those tests, they don't ask the patient anything. She doesn't ask questions. She looks at the test and then makes some kind of differential diagnosis based on this battery of examinations that have taken place. Depending on the specialist, depending on the specialist's area of expertise. But not automatically. There is still a requirement that a physician check the patient, see the patient, observe the patient, make that evaluation. It would be akin, I think, to suggesting that in a courtroom, a judge has the opportunity to evaluate a witness, to determine whether the witness is telling the truth, to identify the credibility of the witness, and that doesn't exist on the record, on the cold record for the appellate court. It's the same reason that the appellate court can't make those credibility determinations. But it's separated into a medical context. So obviously it's not a credibility determination, but it's an evaluation of the patient's condition. So you're suggesting whether or not you need the face-to-face consult would depend on the specialty? It would depend on the expertise. It would depend on the expertise in that case. So some specialties you don't need, and some specialties you would need. And that's precisely why the idea of required expertise should be considered as an element of an evaluation of whether a special relationship exists. So, for example, if it's a radiologist who would simply be reviewing film, we can agree that would be the only evaluation. There's no bedside manner of radiology. There may not be, regardless of the specialty, I say, as the daughter of a doctor. But a pathologist, for example, is not automatically going to be evaluating the patient in person. That's not required for that particular area of specialty. But a consulting emergency room physician doesn't have the expertise to review a slide and evaluate exactly what the condition of that patient is as a pathologist would. That's the distinction. Here you're dealing more with, say, an internist, to take it a little bit away from a urologist and make it a little more broad. An internist has to go through a similar process as an emergency room physician and would need to be at bedside and would need to evaluate the patient and would need to perform that analysis before making a determination about the patient's condition. The emergency room physician can conduct many of those same tasks. And if the emergency room physician concludes in his expertise that he needs someone who is more expert to come in and perform that evaluation as well, that is the obligation of the on-call physician that the emergency room doctor can request. He can request that you come in and do that. The reason I'm asking some of the follow-up questions  about when is the relationship created, an objective test. Usually that deals with the doctor, which he's done, and vis-a-vis the patient. It's that relationship we're talking about. And under the test that you suggest is the law at the present time, it is really, I guess it depends on the emergency room physician, what questions he asks and what he or she is asking of the consult. So that emergency room physician is the one who objectively you suggest that we just look at to say if there's this relationship created or not. Because they're going to determine whether they ask the questions up to this line or they ask the additional questions come in. And I think that's correct. If you consider even the way this concept of special relationship is described in the case law, and we all agree, there can be a duty based on a special relationship, absolutely. Special relationship is essentially created through another physician. So that's exactly right. It very much depends on the nature of the evaluation, the questions asked by the physician who may be initiating that relationship. So when we look objectively at the factors, like a black letter restatement kind of approach, which you're suggesting that has been the law, is the law, and there are good reasons for that from a policy standpoint considering whether or not duty is extended or not extended. That's correct. That's correct. For all these reasons, we ask that the court affirm. Thank you. Thank you. Mr. Shane, rebuttal. Counsel brought up the conversion time period for the statute of repose. I'd like to comment very briefly about that. The timeline was that Dr. DeFranco was made a respondent in discovery in July of 2011, and I think the conversion took place in August of 2000. I'm sorry, September of 2012. September 18th, 2012, the motions file. Yeah, that's exactly right. I adopt our briefs on statute of limitations and on the respondents in discovery. I would refer the courts to the case of Arndt v. Resurrection in which the court held that the six-month period or nine-month period, however you look at it, for converting a respondent in discovery into a defendant is not available to foreshorten a limitations period. It is only available to extend the limitations period. We converted Dr. DeFranco into a defendant in this case within the statute of limitations as I understand it. The statute requires the plaintiff to file her lawsuit within two years of the date in which she is aware or should reasonably be aware of her injury and that it is wrongfully caused, but in no event over four years from the date of the event. This case was filed within two years of her awareness of her injury and that Dr. DeFranco was a wrongful cause. When this case was first filed, when the case was first filed, we had to file a 2622 report where a physician said there's a meritorious case here and in order for the physician to come up with that report, the physician had to review records. The records that were available at that time to review included the urologist record where it says that he recommended antibiotics. It turns out he did not. We had our first information that antibiotics were not recommended by him at the deposition of the emergency room physician and that was more than two years after this event. And I think it was within three weeks we had an additional review including a record that should have been included in the original review and we amended the complaint and we converted his status to the status of a defendant. We acted reasonably and we acted initially based upon records that were inaccurate and that were incomplete. If the standard is a standard of reasonableness, which apparently it is, then at a minimum there's a question of fact as to whether there was a duty on this plaintiff to file an action based in part on a failure to provide antibiotics where the only records that they had indicate that Dr. DeFranco recommended antibiotics. I mean, if our case is you are a urinary tract specialist, you have a sign of urosepsis, you should have recommended antibiotics. The records we had then indicate that he did. After the statute runs, for the first time here, that he didn't recommend antibiotics and we filed in a rush to respond to that. So the issue here is whether we complied with the statute.  does not shorten the statute of limitations. It's all whether we complied with the two-year statute of limitations and four-year statute of repose, which I submitted for the reasons stated in the briefs that we did. And I adopt my briefs on the status of the physician-patient relationship. I think I probably have said it as good as I can say it, although I'm happy to answer any questions anyone has. Any questions? If there's any questions, thank you very much. Thank you all for your time here today and your arguments. This matter is going to be taken under advisement and a written decision will be issued to you. Right now we're going to stand in a brief recess for panel discussion.